VIRTUAL COUNTRIES, INC.,
Plaintiff–Appellant,

v.

REPUBLIC OF SOUTH AFRICA, a
Foreign State, and South African
Tourism Board, an Agency or Instru-
mentality of a Foreign State, Defen-
dants–Appellees.

Docket No. 01–7900.

United States Court of Appeals,
Second Circuit.

Argued: May 2, 2002.

Decided: Aug. 07, 2002.

---

7. The Clerk is authorized to tax costs.

Maxim H. Waldbaum, Salans Hertzfeld Heilbronn Christy & Viener (Lora A. Moffatt, Lori D. Greendorfer, and Joseph E. Petersen, of counsel), New York, NY, for Plaintiff–Appellant.

David B. Goldstein, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York, N.Y. (Roger Bearden, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York, NY, and Terry Gross, Gross & Belsky LLP, San Francisco, CA, of counsel), for Defendants–Appellees.

---

* The Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

1. A domain name, or Uniform Resource Locator, is "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or oth-

Before: MINER and SACK, Circuit Judges, and BERMAN, District Judge.*

SACK, Circuit Judge.

Plaintiff Virtual Countries, Inc., appeals from a June 28, 2001 judgment of the United States District Court for the Southern District of New York (Allen G. Schwartz, *Judge*) that dismissed its petition for relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, based on the court's conclusion that defendants Republic of South Africa (the "Republic") and the South African Tourism Board ("Satour") have sovereign immunity under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11 ("FSIA" or "the Act"), *Virtual Countries, Inc. v. Republic of South Africa*, 148 F.Supp.2d 256, 262 (S.D.N.Y.2001). The district court further concluded that none of the Act's exceptions to immunity applied. *Id.* at 267. Because the Republic's act of which Virtual Countries complains had no "direct effect in the United States," we conclude that none of the FSIA's exceptions, including 28 U.S.C. § 1605(a)(2) on which the plaintiff particularly relies, creates subject matter jurisdiction. We therefore need not and do not address the district court's alternative holding that the Republic's act was not "commercial."

## BACKGROUND

Virtual Countries is a Seattle, Washington-based corporation, that owns Internet domain names [1] including "algeria.com," "bangladesh.com," "belgium.com," and, most pertinently for this appeal, "southaf-

er domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 1127. It "functions much like a telephone number, allowing a user who enters the correct address to reach a particular Web site." *Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14, 19 (1st Cir.2001).

rica.com." Virtual Countries has owned southafrica.com since at least May 13, 1995, using it since October 1996 to "provide[ ] access to news, weather, tourist information, and online shopping opportunities, particularly related to travel, and goods and services, available within or pertaining to the [southern region of the African continent]." Compl. ¶¶ 17–18.

The Republic, a foreign sovereign nation, owns southafrica.net. Satour, its "national tourism agency," has New York offices, operates a web site at satour.org, and owns the domain names satour.net and satour.com.

Two international organizations figure in this appeal. First, the World Intellectual Property Organization ("WIPO") is "one of the 16 specialized agencies of the United Nations system of organizations [that] administers 23 international treaties dealing with different aspects of intellectual property protection." *About WIPO, at* http:// www.wipo.org/about-wipo/en/ (last visited August 6, 2002). One hundred seventy-nine countries maintain membership in WIPO. *Id.* Second, the Internet Corporation for Assigned Names and Numbers ("ICANN") was established in 1998 as a "non-profit, private sector corporation that coordinates a select set of the Internet's technical management functions currently performed by the U.S. Government or its contractors and volunteers." *ICANN: A Structural Overview, at* http://www.icann.org/general/structure.htm (last modified March 24, 2002). Since October 1999, ICANN has supervised a nonbinding arbitral system, the Uniform Domain Name Dispute Resolution Policy ("UDRP"), for resolving domain names disputes. "UDRP proceedings are conducted by administrative dispute resolution service providers approved by ICANN.... ICANN has accredited four service providers and WIPO is one of them." *Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14, 21 (1st Cir. 2001).

In July 2000, in response to various governments' requests to assess, *inter alia,* the extent of and possible solutions for "bad faith, abusive, misleading or unfair use of ... geographical indications," WIPO initiated the "Second Internet Domain Name Process." In the course thereof, the Republic submitted comments to WIPO arguing that second-level domain names and generic top-level domains ("gTLDs")[2] "that are the same as the official or common names of sovereign nations" should be protected "against bad faith, abusive, misleading, or unfair registration and use." The Republic cited as examples domain names containing the word "SouthAfrica," albeit without explicit reference to Virtual Countries, as having "substantial political and economic value" that were "national assets belonging to the ... sovereign nation[ ]." The Republic further recommended binding UDRP arbitration governed by the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 in disputes over such names. Only in April 2001, after the relevant events in this dispute had transpired, did WIPO issue an interim report exploring possible solutions.

On October 30, 2000, the Republic issued a press release, the act that lies at the core

---

**2.** A domain name ... comprises a series of alphanumeric fields, or "domains," separated by periods or "dots." Within each domain name, the alphanumeric field to the far right is the Top Level Domain ("TLD").... Thus, TLDs are the highest subdivisions of Internet domain names.... There are currently ... seven generic TLDs ("gTLDs"), namely, ".com," ".net," ".org," ".edu," ".gov," ".int," and ".mil"....

*Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 577 (2d Cir.2000).

of this litigation. The release asserted that the Republic "could be the first country in the world to make a challenge for the right to own its own domain name" in the generic top level domain ".com."[3] The press release explained that the Republic intended to lodge "an application claiming the www.southafrica.com domain" with WIPO before November 10, 2000 because it wished to use that domain as a "strategic marketing tool in promoting trade and tourism." The press release also noted the Republic's aim to "take this matter [the ownership of www.southafrica.com] up in international fora" such as ICANN. And it reaffirmed the Republic's position that sovereign "countries ha[ve] the first right to own their own domain names."

*The Complaint and District Court Decision*

One week later, on November 6, 2000, Virtual Countries filed a complaint in the United States District Court for the Southern District of New York seeking declaratory relief pursuant to 28 U.S.C. §§ 2201–02 to the effect that the Republic lacked rights to the domain name "www.southafrica.com." The plaintiff also sought injunctive relief against any "arbitration or court proceedings in any forum worldwide" challenging its rights to that domain name. Compl. ¶ 33(b). According to the complaint, the Republic's October 30 press release demonstrated its intent to "reverse-hijack[ ]"[4] www.southafrica.com because it lacked a legitimate claim that could be established either before an ICANN arbitral forum or under United States law.

Compl. ¶¶ 2–3. In a declaration responding to the defendants' motion to dismiss, Virtual Countries' president and principal shareholder, Gregory Paley, explained that the press release had a "devastating and direct effect ... on Virtual Countries' short and long-term business operations." Paley Decl. ¶ 10. Paley asserted that the press release placed a "cloud" on Virtual Countries' ownership of domain names, obliging it to sell "switzerland.com." *Id.* ¶ 12. In addition, he said, a "possible strategic alliance" with a South African firm had failed due to the potential partner's fear of "reprisals from the South African government." *Id.* ¶ 13.

On April 30, 2001, the defendants moved pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss the action for want of subject matter jurisdiction. They submitted a declaration of Andile Abner Ngcada, Director General of the South African Department of Communications, in which Ngcada explained that the Republic, in issuing the press release, had been "engag[ed] in international multistate, State–to–State and regional international diplomacy regarding the appropriate position that the relevant international bodies should follow regarding domain name registration of the names of sovereign nations." Ngcada Decl. ¶ 5. Ngcada further stated that the Republic had decided "not [to] commence an arbitration before WIPO or any other organization that has adopted ICANN's UDRP under the UDRP procedures currently in place." *Id.* ¶ 8.

---

3. The press release, while issued on letterhead of the South African government, does not state its location of issuance. The parties apparently agree that the press release was not issued in the United States; there does not appear to be any contrary evidence in the record. For purposes of this appeal, we also accept this assumption.

4. According to the plaintiff, reverse hijacking involves "an attempt by a more formidable entity to take an address away from a less powerful, but otherwise legitimate, owner." Compl. ¶ 2. The First Circuit uses the same term to describe instances in which "trademark owners abusively assert their trademark rights to strip domain names from rightful owners." *Sallen,* 273 F.3d at 17.

The district court granted the defendants' motion to dismiss because it concluded that subject matter jurisdiction under the FSIA was wanting. *Virtual Countries*, 148 F.Supp.2d at 268. The district court observed that absent the availability of a statutory exception, the FSIA granted general immunity from suit to "foreign states," including both the Republic and its instrumentality, Satour. *Id.* at 262. According to the court, the sole possible basis for subject matter jurisdiction required that the Republic's act, the preparation and initial dissemination of the press release, had been "taken 'in connection with a commercial activity' " and had had a " 'direct effect' " in the United States on the plaintiff. *Id.* at 263. The court concluded, however, that issuance of a press release was not a "commercial" activity. *Id.* at 263–65. Rather, the press release was part of the Republic's diplomatic efforts before WIPO, an international organization. *Id.* at 265. The district court further held that the press release had no direct effect in the United States. *Id.* Even assuming that financial loss or opportunity loss sufficed as a basis for jurisdiction, the district court rejected the plaintiff's allegations to this effect as "entirely conclusory." *Id.* at 266–67. Finally, the district court noted that Virtual Countries failed to state a claim against Satour, which had played no part in preparing or issuing the press release. *Id.* at 269.

Virtual Countries appeals.

## DISCUSSION

Virtual Countries contends that we must vacate the district court's judgment because its sovereign immunity analysis was erroneous and because of fatal procedural mistakes in the district court proceedings. We disagree, concluding that the district court (i) correctly found that the Republic's press release had no "direct effect" in the United States, and (ii) committed no procedural error. We affirm on these grounds and therefore need not and do not reach the question whether the district court correctly concluded that the Republic's issuance of the press release was not "commercial activity."

### I. Standard of Review

■ We review a district court decision to dismiss an action for want of subject matter jurisdiction on a Rule 12(b)(1) motion for clear error with respect to factual findings and *de novo* with respect to legal conclusions. *See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 249 (2d Cir.2000); *accord Robinson v. Gov't of Malaysia*, 269 F.3d 133, 138 (2d Cir.2001). *De novo* review is appropriate even where, as here, the district court supplements the allegations in the complaint with "undisputed facts from the record." *Robinson*, 269 F.3d at 138.

### II. Claims Against Satour

The district court dismissed all claims against Satour under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted because Virtual Countries had not alleged that Satour was involved in the October 30 press release. *Virtual Countries*, 148 F.Supp.2d at 269. Virtual Countries does not now dispute this conclusion, which is therefore undisturbed on appeal. *Cf. Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir.2002) (holding that where one of the district court's independent grounds for dismissing a complaint as against one of several defendants goes unchallenged by the plaintiff, the dismissal of that defendant is not at issue on appeal). The sole defendant remaining is therefore the Republic.

III. Federal Court Subject Matter Jurisdiction Over Actions Involving Foreign States

■ Under the FSIA, federal district courts

have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of [28 U.S.C.] or under any applicable international agreement.

■ 28 U.S.C. § 1330(a). The FSIA further provides that "a foreign state shall be immune from [such] jurisdiction ... except as provided in sections 1605 to 1607" of the FSIA. *Id.* at § 1604. "The FSIA thus provides the sole basis for obtaining [subject matter] jurisdiction over a foreign sovereign in the United States." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (internal quotation marks omitted); *accord Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

Most of the exceptions to foreign states' immunity are contained in 28 U.S.C. § 1605, which provides in pertinent part:

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . .

in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). Virtual Countries contends that the Republic is not immune from suit in a United States court because, under the third clause of § 1605(a)(2), the claims in this case are "based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States." *Id.* For a defendant foreign state to be amenable to jurisdiction under the third clause, the lawsuit for which jurisdiction is sought must be (1) "based ... upon an act outside the territory of the United States"; (2) "that was taken in connection with a commercial activity of [the foreign state] outside this country"; *and* (3) "that caused a direct effect in the United States." *Weltover,* 504 U.S. at 611 (internal quotation marks and punctuation omitted). We focus on the third requirement, a direct effect in the United States, and find the absence thereof dispositive of this appeal.

IV. Direct Effect in the United States

■ "[A]n effect is direct if it follows as an *immediate* consequence of the defendant's activity." *Id.* at 618, 112 S.Ct. 2160 (internal citation and punctuation omitted; emphasis added). Immediacy implies no "unexpressed requirement of 'substantiality' or 'foreseeability,' " but rather "ensures that jurisdiction may not be predicated on purely trivial effects in the United States." *Id.* "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232, 1238 (10th Cir.1994), *cert. denied,* 513 U.S. 1112, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995); *accord Voest–Alpine Trading USA*

*Corp. v. Bank of China,* 142 F.3d 887, 894–95 n. 10 (5th Cir.) ("[T]he third clause does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States."), *cert. denied,* 525 U.S. 1041, 119 S.Ct. 591, 142 L.Ed.2d 534 (1998).

## A. The Press Release's Effect

Virtual Countries argues that the preparation and initial dissemination of the press release "cause[d] a direct effect in the United States," 28 U.S.C. § 1605(a)(2), by having a "devastating and direct effect . . . on [its] business operations," Paley Decl. ¶ 10. Paley explains that the press release's message damaged the plaintiff's ability to raise capital, "threaten[ed] Virtual Countries' continued corporate existence," and forced it to divest one of its assets, "switzerland.com," to obtain funds to cover operating expenses. *Id.* ¶¶ 10–12. Paley further explains that the principal injury, a diminishment in Virtual Countries' ability to raise capital, is particularly acute because the plaintiff's "continued growth and ultimately its corporate survival [as an internet-based start-up company] depends entirely upon its ability to raise funds in the capital markets." *Id.* ¶ 11 (emphasis added).

But even accepting the plaintiff's account for purposes of the motion to dismiss, the press release's effect falls at the end of a long chain of causation and is mediated by numerous actions by third parties. First, the Republic issued the press release. Then wire services and newspapers in South Africa and elsewhere obtained the release and wrote articles about it. Current or potential investors—perhaps in the United States, perhaps in other countries, and perhaps in both—and a potential strategic business partner in South Africa, allegedly then learned of the release's contents. Drawing on news reports, they then formed their own independent assessments of the Republic's intentions and the possible effect of those intentions on Virtual Countries and people who would do business with it. Among these independent assessments was speculation about possible "reprisals" by the Republic. Paley Decl. ¶ 13. Only then could investors and the prospective business partner have decided to give effect to their doubts as to the validity of the plaintiff's current registration of southafrica.com and their fears of reprisal by the Republic, by declining to invest in or do business with Virtual Countries.

At a minimum, two independent kinds of actors—first the press and then investors, potential investors, and potential business partners—intervened between issuance of the press release and any alleged injurious effect on the plaintiff. *Cf. United World Trade,* 33 F.3d at 1238 (concluding that there was no jurisdiction where the direct effect was "dependent on an intervening factor"). Any ultimate effect on Virtual Countries depended principally on a shift in investors' sentiments regarding the plaintiff's prospects.[5] The press release's

---

5. In *Weltover,* the Supreme Court rejected an argument similar to the plaintiff's, which also depended on the reputational consequences of an extraterritorial act. Before concluding that certain effects of the actions of a defendant, in that case Argentina, were "direct" under the FSIA, the Court held that the impact of Argentina's rescheduling of bond repayments on New York's prestige as a financial center was "too remote and attenuated to satisfy the 'direct effect' requirement of the FSIA." 504 U.S. at 618, 112 S.Ct. 2160 (citation omitted). Although the effect on New York's reputation was minor—while the alleged effect of the press release on Virtual Countries was, by contrast, significant—the Supreme Court's conclusion did not rest on the magnitude of the alleged effect, *see id.* (rejecting a "substantiality" requirement), but rather on its remoteness.

effect thus depended crucially on variables independent of the Republic. This tangled causal web does not provide the requisite immediacy to establish jurisdiction. *See Weltover,* 504 U.S. at 618, 112 S.Ct. 2160; *cf. United World Trade,* 33 F.3d at 1238 (finding no direct effect "under any common sense reading of that phrase" following a "series of banking transactions ... from Sicily to London to New York to Paris").

Nor, in our view, would extending the commercial acts exception to the type of remote harm alleged here further the Act's purposes. The legislative history of the FSIA suggests that Congress adopted it to mitigate the "considerable uncertainty" that arises when a "private party ... deals with a foreign government" and immunity is "decided on the basis of nonlegal considerations." H.R.Rep. No. 94–1487, at 9 (1976), *reprinted* in 1976 U.S.C.C.A.N. 6604, 6607. Defining "direct effect" to permit jurisdiction when a foreign state's actions precipitate reactions by third parties, which reactions then have an impact on a plaintiff, would foster uncertainty in both foreign states and private counterparties. Neither could predict when an action would create jurisdiction, which would hinge on third parties' independent reactions and conduct, even if in individual cases, such as the one at bar, a particular effect might be foreseeable. To permit jurisdiction in such cases would thus be contrary to the predictability interest fostered by the statute.

■ Finally, to conclude that the press release had an impact on Virtual Countries, we must speculate that investors or potential investors were prepared initially to extend further capital to the plaintiff. We must then surmise that the release had an outcome-determinative impact on such decisions. Yet the press release mentioned only the Republic's *intention* to initiate an arbitral dispute in WIPO and to lodge proposals with ICANN. Especially in light of the tentative and indefinite nature of the release, it is speculative to conclude that it, rather than other events, triggered the plaintiff's alleged injury. A "speculative" injury of this kind does not suffice to satisfy § 1605(a)(2)'s third clause. *See Gen. Elec. Capital Corp. v. Grossman,* 991 F.2d 1376, 1386 (8th Cir. 1993) (holding that an American corporation's loss of an opportunity to acquire a foreign entity was too "speculative" to establish jurisdiction).[6]

### B. Corporate Entities and the Direct Effects Clause

Attempting to sidestep these "directness" problems, Virtual Countries emphasizes the press release's "devastating impact upon [its] business" in the United States, which allegedly left it incapable of raising capital. Appellant's Br. at 27–28. Virtual Countries suggests that so significant a financial loss on the part of an American corporation necessarily occurs within the United States and hence satisfies the direct effect test. *Id.* at 28–31.

The plaintiff's argument is based on the difficulty in assigning loci to financial harms inflicted on corporate entities. Indeed, we have long recognized that "[a]pplying the term ["direct effect in the Unit-

---

**6.** Whether the Republic knew in advance what impact the press release would have on the plaintiff is, moreover, irrelevant. "[F]oreseeability" does not establish directness. *Weltover,* 504 U.S. at 618, 112 S.Ct. 2160; *see also Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 999 F.2d 33, 36–37 (2d Cir.1993) (noting that even though the plaintiff was American, and the defendant's acts had a predictable impact on the plaintiff, no direct effect occurred in the United States), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

ed States"] to a corporation is not ... simple." *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). We have said in this context that "[a] corporation is no more than a series of conduits, filtering profit—or loss—through each stage from the company's customers to its shareholders, who may themselves be fictional entities as well." *Id.* Locating the situs of an injury to a corporation "is an enterprise fraught with artifice." *Id.*

Virtual Countries posits that *Texas Trading*, in confronting these difficulties, held that *any* "U.S. corporation's financial loss constitute[s] a direct effect in the United States," regardless of where relevant acts occurred. Appellant's Br. at 29. The plaintiff distinguishes these claims from others in which "an individual harmed financially by the tort happened to be an American citizen, but the tortfeasor's conduct was not directed at the United States" or "otherwise connected to the United States." *Id.* at 29 n. 14.

But *Texas Trading* does not support the plaintiff's argument. There, the Federal Republic of Nigeria had repudiated contracts for the purchases of cement from the plaintiffs after overestimating what could be unloaded at the Nigerian port of Lagos/Apapa. 647 F.2d at 303–05. Although the cement was to be delivered at Lagos, payment to the American cement manufacturers was, under the terms of the contract, to occur in New York. *Id.* at 304. We concluded that the FSIA's jurisdictional predicate was satisfied under the third clause of 28 U.S.C. § 1605(a)(2). *Id.* at 307–13. The effect of Nigeria's breach was "direct" because the plaintiffs "were beneficiaries of the contracts that were breached." *Id.* at 312. Further, the locus of the contracts was the United States, where the plaintiffs "were to present docu-

ments and to collect money." *Id.; see also Weltover*, 504 U.S. at 619, 112 S.Ct. 2160 (finding the geographical nexus met where "[m]oney that was supposed to have been delivered to a *New York* bank for deposit was not forthcoming") (emphasis added); *Martin v. Republic of South Africa*, 836 F.2d 91, 94 (2d Cir.1987) (noting that "the term 'in the United States' was satisfied [in *Texas Trading* ] since the companies were to present documents and collect money in the United States, but the breach by Nigeria precluded them from doing so").

■ Satisfaction of the geographical jurisdictional nexus in *Texas Trading* depended on the fact that the contract stipulated performance in New York, not on plaintiffs' corporate form. Every circuit court of which we are aware that has addressed this issue has held—without reference to whether the plaintiff was a corporation, a non-corporate business entity, or a natural person—that an anticipatory contractual breach occurs "in the United States" for the jurisdictional purposes of § 1605(a)(2) if performance could have been required in the United States and then was requested there. *See Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir.2002) (finding the jurisdictional predicate met where "defendants agreed to pay but failed to transmit ... promised funds to an account in a Cleveland bank"); *Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 132 (2d Cir.1998) (finding jurisdiction where funds were to be paid to a New York bank account); *Voest–Alpine Trading*, 142 F.3d at 896 (finding an effect in the United States when "funds [were] not remitted to [an] account at a Texas bank"); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir.1997) (finding jurisdiction where "New York was the place of performance of Nigeria's ultimate contractual obligation"); *Commercial*

*Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 241 (2d Cir.1994) (finding a direct effect in the United States where defendants failed "to remit funds in New York, as they were contractually bound to do"); *see also Reed Int'l Trading Corp. v. Donau Bank AG,* 866 F.Supp. 750, 754–55 (S.D.N.Y.1994) (concluding that a direct effect occurs when a bank fails to perform in New York).

The plaintiff's situation in the case before us is not analogous to *Texas Trading* for purposes of determining jurisdiction under the FSIA. No obligation—contractual or otherwise—ran to the plaintiff from the Republic, let alone one to be performed in the United States. Nor can we identify any "effect" analogous to the contractual obligation in *Texas Trading.* In cases closer to *Texas Trading* than the one at bar, where, for instance, "defendants could have discharged their obligations by tendering payment elsewhere" and had no specific objection to tender performance in the United States, courts have declined jurisdiction under the FSIA because of the absence of a direct effect. *Dar El–Bina Eng'g & Contr. Co. v. Republic of Iraq,* 79 F.Supp.2d 374, 382–85 (S.D.N.Y.2000) (finding jurisdiction only over those contracts at issue in which New York was designated as the place of performance); *see also United World Trade,* 33 F.3d at 1238 (finding "lost profits" insufficient for jurisdiction); *Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143, 1146 (D.C.Cir. 1994) (finding no jurisdiction where no "United States location was designated as the 'place of performance' "), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995); *Int'l Hous. Ltd. v. Rafidain Bank Iraq,* 893 F.2d 8, 11 (2d Cir.1989) (finding no direct effect where losses were incurred overseas by a foreign corporation).

The plaintiff's more expansive theory, that *any* "U.S. corporation's financial loss constitute[s] a direct effect in the United States," Appellant's Br. at 29, is plainly flawed. Endorsement of this view would render superfluous the analysis, followed by every circuit court of which we are aware that has addressed this question, of the locus of contractual obligation when deciding whether a direct effect occurred in the United States under the FSIA. *See, e.g., Keller,* 277 F.3d at 818; *Hanil Bank,* 148 F.3d at 132; *Voest–Alpine Trading,* 142 F.3d at 896; *Adler,* 107 F.3d at 727.

Our FSIA jurisprudence is also altogether inconsistent with the plaintiff's theory. In *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 999 F.2d 33 (2d Cir. 1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994), for example, we held that a plaintiff whose airplane had been seized in Lagos, Nigeria, but who drew funds in New York for its release, had not established FSIA jurisdiction. Construing the third clause of the FSIA's commercial activities exception and its tort exception, 28 U.S.C. § 1605(a)(5), we noted that "[i]f a loss to an American individual *and firm* from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states" because contractual breaches would be pleaded as torts of conversion or fraud. *Id.* at 36 (emphasis added).

The plaintiff's construction of the third clause of the commercial activities exception is also contradicted by our endorsement of the " 'legally significant acts' test," which "requires that the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply." *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 931 (2d Cir.1998); *see*

also *Hanil Bank,* 148 F.3d at 133 (endorsing the legally significant act test to find jurisdiction based on a breach of contract in the United States); *Antares Aircraft,* 999 F.2d at 35 n. 2 (noting that the Supreme Court in *Weltover* had not cast doubt on the legally significant act test used in *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 948 F.2d 90, 95 (2d Cir.1991), *vacated by* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992), and hence the test remains good law); *cf. Adler,* 107 F.3d at 726–27 (noting that "mere financial loss" without a legally significant act does not establish jurisdiction); *United World Trade,* 33 F.3d at 1239 (same). *But cf. Keller,* 277 F.3d at 818 (declining to adopt the legally significant act test as an "addition of [an] unexpressed requirement[ ] to the statute"); *Voest–Alpine Trading,* 142 F.3d at 894–95 (same). If Virtual Countries were right and any economic harm to it as a corporation was necessarily a direct effect under the FSIA, the legally significant act test would be meaningless.

 Finally, even had the plaintiff identified a legally sufficient direct effect, we would nonetheless agree with the district court that the "bald assertions" of harm contained in the complaint were not sufficient to defeat the motion to dismiss. *Virtual Countries,* 148 F.Supp.2d at 269. *See Zappia,* 215 F.3d at 253 ("[C]onclusory allegations in [a complaint and declaration] are not sufficient to create a material issue of fact."). In contrast to a Rule 12(b)(6) motion to dismiss for failure to state a claim, in a challenge to FSIA subject matter jurisdiction, the defendant must present a *"prima facie* case that it is a foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993); *accord Robinson,* 269 F.3d at 141 n. 7. That was uncontested here. Then, *the plaintiff* "has the *burden of going forward*

with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Cargill,* 991 F.2d at 1016 (emphasis added); *accord Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for A.W. Galadari,* 12 F.3d 317, 325 (2d Cir.1993), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994). Determining whether this burden is met involves a "review [of] the allegations in the complaint, the undisputed facts, if any, placed before [the court] by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—[resolution of] disputed issues of fact." *Robinson,* 269 F.3d at 141. The "ultimate *burden of persuasion* remains with the alleged foreign sovereign." *Cargill,* 991 F.2d at 1016 (emphasis added); *Robinson,* 269 F.3d at 141 n. 8 (noting that this burden must be met by a preponderance of the evidence).

Despite an opportunity to come forward with evidence to meet its burden of production in order to prevail on the jurisdiction issue, Virtual Countries failed to provide sufficient evidence for the contentions that it had lost investment opportunities, or that its financial difficulties resulted from the Republic's actions. *Virtual Countries,* 148 F.Supp.2d at 266–67. Thus, even if the complaint detailed legally significant acts, the district court would have been correct to dismiss the complaint based on the plaintiff's failure to show a causal connection between those acts and the alleged injury it sustained.

## V. Procedural Challenge

 Virtual Countries argues that the district court also erred by failing to apply a *"prima facie"* standard—which we understand to refer to the allocation of burdens outlined above—and by failing to allow discovery. Again, we disagree. As noted, after a defendant presents a *prima*

*facie* case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that under the FSIA's exceptions the defendant lacks immunity. The district court reviews the allegations in the complaint and any undisputed facts supplied by the parties. The ultimate burden of persuasion by a preponderance of the evidence nevertheless remains with the alleged foreign sovereign.

The district court in the case before us correctly applied this burden-shifting framework. At the opinion's outset, the court acknowledged the unchallenged fact that the defendants were a foreign state and its instrumentality covered by the FSIA. *Virtual Countries*, 148 F.Supp.2d at 262. Turning to whether Virtual Countries had "sufficiently alleged or proffered evidence to support jurisdiction," *Robinson*, 269 F.3d at 141, that is, met its burden of going forward, the court concluded that it had not. *Virtual Countries*, 148 F.Supp.2d at 262–68.

The district court did state that it found "Paley's allegations [in his declaration in opposition to the motion to dismiss] ... insufficient to *establish* the requisite direct effect under Section 1605(a)(2)." *Id.* at 266 (emphasis added). But we do not think that the word "establish" in this context implies that the district court improperly shifted the ultimate burden of persuasion on the issue of immunity to the plaintiff. It reflects nothing more than the court's acceptance for Rule 12(b)(1) purposes of Virtual Countries' allegations as factually correct and its conclusion that the plaintiff fell short of its burden of going forward.

 Finally, the district court had no obligation to order further discovery when Virtual Countries had requested none. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 145 (2d Cir.2001) (finding a waiver of an evidentia-ry hearing in an FSIA action when the plaintiff failed to request it in the district court and on appeal); *see generally Zappia*, 215 F.3d at 253 (reviewing the denial of an evidentiary hearing under an abuse of discretion standard).

## CONCLUSION

For the foregoing reasons, the district court's judgment is affirmed.