# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued January 19, 2018          Decided July 3, 2018

No. 17-7067

EIG ENERGY FUND XIV, L.P., *ET AL.*,
APPELLEES

v.

PETROLEO BRASILEIRO, S.A.,
APPELLANT

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00333)

―――――

*Catherine E. Stetson* argued the cause for appellant. With her on the briefs were *Adam K. Levin* and *Sean Marotta*.

*Daniel B. Goldman* argued the cause for appellees. With him on the brief were *Barry Coburn* and *Kerri Ann Law*.

Before: HENDERSON and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 2012 and 2013, an American investment fund sank $221 million into what seemed like a sure bet: buying equipment to extract a massive, newly discovered reserve of undersea crude oil off the coast of Brazil. Brazilian politicians and corporate executives also saw an opportunity and set up a scheme to make illegal use— including payment of bribes and kickbacks—of investors' money. The eventual revelation of the corruption produced the largest political scandal in modern Brazilian history. In light of the scandal, banks were no longer willing to make loans for the oil-extraction project, which collapsed, taking the American fund's money with it.

Behind the project—and at least some of the corruption— was Petroleo Brasileiro, S.A. (Petrobras), Brazil's state-owned oil company. The jurisdiction of U.S. courts over claims against foreign states and their "instrumentalities," like Petrobras, is limited by the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1604–1606, so we must determine whether Petrobras's alleged fraud "caused a direct effect in the United States," *id.* § 1605(a)(2). If it did—as the district court held—then Petrobras is "liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 1606. Otherwise, Petrobras "shall be immune from the jurisdiction of the courts of the United States." *Id.* § 1604.

## I. Background

In 2006 Petrobras discovered an estimated 50 billion barrels of undersea oil off the coast of Brazil.[1] Although costly

---

[1] The factual background is derived from the allegations of the plaintiffs' first amended complaint, which we accept as true in reviewing the denial of a motion to dismiss. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002).

to extract, the sheer size of the deposit was tantalizing not only to the Brazilian state—which had a direct economic interest in the find through Petrobras, the state-owned oil company—but to investors around the world. Petrobras soon formed a foreign-investment venture to build 28 specialized "drill ships" at a cost of more than $700 million apiece. The business plan for the venture, named Sete Brasil Participações, S.A. (Sete), called for equity investment of around 7.9 billion Brazilian Reais ($2.19 billion at today's exchange rates), with approximately 4.6 per cent of that coming from Petrobras itself. The remainder of the ships' cost was to be debt-financed through third-party lenders.

To attract foreign investment, Brazilian law provides tax incentives through special partnerships known as Fundos de Investimento em Participações, or FIPs. Petrobras created FIP Sondas to facilitate foreign investment in the Sete project. Petrobras specifically targeted U.S. investors for Sete, Joint Appendix (JA) 25, including EIG Management Company, LLC (EIG), a Washington, D.C.–based private equity fund. Petrobras disseminated in the United States, including to EIG, a presentation called "The Drilling Rigs Project: Petrobras'[s] Strategy for its Successful Implementation." JA26. The presentation contained a "Cautionary Statement for US Investors," referencing U.S. Securities and Exchange Commission rules governing oil and gas investment. JA26–27. Another document disseminated by Petrobras in the United States, titled "Pre-Salt Oil Rigs Project," "discussed the Sete investment premise and touted that Sete would have 'management with extensive experience in the market.'" JA27–28. A third document "promoting investment in Sete" was sent to EIG by a putative Petrobras agent nearly a year after the first two documents circulated. JA28.

Petrobras and Sete executives also met with EIG executives in the United States at least twice. At one meeting, in Houston, Texas, Sete CEO João Carlos de Medeiro Ferraz (Ferraz) "offered rosy descriptions of Sete and its business prospects." JA29. At another, in Washington, D.C., Ferraz addressed a conference of EIG employees and investors and "informed [them] that Sete expected drillship charter revenue 'of almost $90 billion [in] the next 20 years.'" JA30 (second alteration in original). EIG employees twice traveled to Brazil to meet with Petrobras representatives, and Petrobras or Sete corresponded extensively with EIG leading up to EIG's investment, through written memoranda, presentations, telephone calls and emails.

EIG ultimately invested $221 million in FIP Sondas between August 2012 and May 2013, on behalf of eight funds under its management. Six of the eight EIG funds were based in Delaware but the other two were based in the Cayman Islands, which Brazil has designated as a tax haven. Because investors from designated tax havens are ineligible for the tax incentives provided FIP investments, EIG formed EIG Sete Parent SARL (EIG Sete Parent), a Luxembourg corporation, which in turn formed EIG Sete Holdings SARL (EIG Sete Holdings), also a Luxembourg corporation. EIG's investment in Sete therefore flowed from the eight funds to EIG Sete Parent, to EIG Sete Holdings, to FIP Sondas and, ultimately, to Sete itself.

Brazilian prosecutors' "Operation Car Wash" became public in 2014. The multi-year investigation uncovered extensive corruption in the Brazilian government, including Petrobras, and in the private-sector oil industry, including Sete. To date, prosecutors have obtained 93 convictions against officials engaged in a bribery and kickback scheme going back to at least 1997. Among the guilty were senior executives at

Sete, including Ferraz, EIG's primary contact at Petrobras and Sete. A 30-year employee of Petrobras, Ferraz became the chief executive of Sete sometime before the spring of 2013, when he met with EIG in Houston. Ferraz was EIG's primary contact regarding its Sete investment, first, while he was at Petrobras and, later, when he was Sete CEO. In testimony given to an investigative panel of the Brazilian Congress in 2015, Ferraz explained that "[t]he capital market in the United States, in particular, loves [Sete's] type of business. They very much like the prospects of financing drilling rigs, despite the risks involved." JA233. And so, Ferraz testified, "[t]here was great market interest [in Sete], particularly among US private equity groups" such as EIG. JA218. Another Sete executive, chief operating officer Pedro José Barusco, testified to the Brazilian Congress that he and Ferraz had taken "the initiative to create Sete Brasil" and that "the establishment of bribe amounts … was a continuity [*sic*] of what happened in Petrobras." JA23, JA31 (compl.).

As the scandal of Operation Car Wash enveloped Sete and Petrobras, skittish lenders withdrew their support from the drill ships project. Because the project was highly leveraged by design, the loss of debt financing made it impossible to proceed with construction. Facing insolvency, Sete declared bankruptcy. Investors, including EIG, were left with nothing but worthless shares.

EIG sued Petrobras and the other defendants in district court, alleging counts of fraud, aiding and abetting fraud and civil conspiracy to commit fraud.[2] Petrobras moved to dismiss

---

[2] Because Sete is not an "instrumentality" of the Brazilian government, it would not be immune from suit under the FSIA. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (only direct ownership by foreign state makes corporation an instrumentality

for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[3] Petrobras asserted that, as an instrumentality of the Brazilian state, it is immune from suit on EIG's claims under the FSIA.

The district court denied Petrobras's motion to dismiss, concluding that EIG's claims fall within the FSIA's commercial activity exception to foreign-state immunity. *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 72 (D.D.C. 2017); *see* 28 U.S.C. § 1605(a)(2). Although EIG argued that each of the three clauses of the commercial-activity exception applied, the district court relied on the third clause only, which clause grants jurisdiction over claims "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

The district court reasoned that EIG's injury "occurred at the time Petrobras successfully induced [it] to invest in the Petrobras-Sete project," which injury "occurred, at least in part, in the United States." 246 F. Supp. 3d at 72. Because the court concluded that EIG's injury occurred in the United States, it rejected Petrobras's argument that EIG's structuring its investment through its Luxembourg subsidiaries—that is, EIG Sete Parent and EIG Sete Holding—constituted an

---

under FSIA). Sete's bankruptcy, however, would likely have made it futile for the plaintiffs to include Sete as a defendant.

[3] Petrobras also moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted but the district court's denial of Petrobras's motion on that ground is not before us in this interlocutory appeal.

"intervening event[]" that made EIG's U.S. injuries "indirect." *Id.*

Moreover, the district court found that "Petrobras did not merely establish Sete" but "'installed its own former employees'—including the architects of Sete and the bribe scheme, Ferraz and Barusco—for the purpose of continuing the corrupt enterprise." *Id.* (quoting Pl.'s am. compl. 12). Therefore, it was irrelevant to the court's analysis that Sete, not Petrobras, made the misrepresentations that immediately preceded EIG's decision to invest: "Sete's deceptive conduct, occurring only after it grabbed the baton from Petrobras, is not the kind of 'independent' third-party action that breaks the causal chain between Petrobras'[s] own misrepresentations and [EIG's] injury." *Id.*

Petrobras timely appealed the denial of its motion under Rule 12(b)(1), invoking our interlocutory appellate jurisdiction under 28 U.S.C. § 1291. *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1025 (D.C. Cir. 1997) ("It is well[ ]established that an appeal from a denial of a motion to dismiss a complaint on the ground of sovereign immunity under the FSIA satisfies the three requirements of the collateral order doctrine and may thus be brought on an interlocutory basis.").

## II. Analysis

### A. Standard of review and burden of proof

"The Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United

States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Nelson*, 507 U.S. at 355.

"Once the defendant has asserted the jurisdictional defense of immunity under the FSIA, the court's focus shifts to the exceptions to immunity" provided in the Act. *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Id.* (quoting *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985)). Although the plaintiff bears the ultimate burden of proving its substantive claims, the foreign-state defendant bears the burden of establishing the affirmative defense of immunity. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131 (D.C. Cir. 2004); *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994).

If an FSIA defendant contests only the legal sufficiency of the plaintiff's jurisdictional claims, our standard of review is akin to that applied under Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief. *Price*, 294 F.3d at 93 (citing *Browning v. Clinton*, 292 F.3d 235, 241–42 (D.C. Cir. 2002)). "A claimant need not set out all of the precise facts on which the claim is based in order to survive a motion to dismiss." *Id.* at 93.

### B. Petrobras's alleged fraud caused a direct effect in the United States

Petrobras is subject to the jurisdiction of U.S. courts if it "caused a direct effect in the United States." 28 U.S.C.

§ 1605(a)(2). Under the direct-effect exception to foreign-state immunity, a plaintiff must make three showings: that the "lawsuit is (1) 'based upon . . . an act [of a foreign state] outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and (3) that 'cause[d] a direct effect in the United States.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (quoting 28 U.S.C. § 1605(a)(2)). Petrobras does not contest that the first two of these elements are satisfied; we need concern ourselves, then, with the third only.

A "direct" effect is one that "follows 'as an immediate consequence of the defendant's . . . activity.'" *Id.* at 618 (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991)). Although "jurisdiction may not be predicated on purely trivial effects in the United States," there is no "unexpressed requirement of 'substantiality' or 'foreseeability.'" *Id.*

We believe EIG has made out a *prima facie* case for jurisdiction by alleging that Petrobras specifically targeted U.S. investors for Sete, JA25; that Petrobras intentionally concealed the ongoing fraud at Petrobras and at Sete, JA26–27; and that money invested in Sete was used to pay bribes and kickbacks, JA32–34. *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016) (defendant's misrepresentations about investment cause direct effect in United States when defendant "contemplated investment by United States persons" and "at least some investors . . . suffered an economic loss in this country as a result of those misrepresentations."). The burden is therefore on Petrobras to establish an affirmative defense to jurisdiction. *Princz*, 26 F.3d at 1171.

Petrobras raises two defenses to jurisdiction: that it did not *cause* EIG's injuries because intervening acts—third-party lenders' decisions not to lend to Sete—"broke the chain of causation," Appellant's Br. 31–35; and that Petrobras's alleged fraud did not cause a direct effect *in the United States* because EIG's injury occurred, again, not in the United States, its investment having been funneled through corporate subsidiaries in Luxembourg, *id.* at 20–31. Both arguments fail.

**1. No intervening act "broke the chain of causation"**

Petrobras's "chain of causation" argument fails for two reasons. First, EIG was injured by Petrobras's alleged fraud even before the lenders withdrew; additionally, Petrobras's argument would protect it from liability even for the portion of EIG's damages incurred before the lenders withdrew. Petrobras effectively proposes a highly restrictive causation requirement under which contributing factors readily and predictably caused by the defendant's same act would preclude jurisdiction.

We rejected a similar argument in *Kilburn*, 376 F.3d at 1129. The Lebanese terrorist group Hezbollah abducted Peter Kilburn, a U.S. citizen, in Beirut in 1984 and subsequently sold him to the Arab Revolutionary Cells (ARC), a terrorist group based in Libya. ARC tortured and killed Kilburn, whose brother brought suit against Hezbollah's and ARC's state sponsors, Iran and Libya, respectively. *Id.* at 1125. The *Kilburn* plaintiff invoked the "terrorism exception" to foreign-state immunity, which applies to a lawsuit against a foreign state "for personal injury or death that was *caused by* an act of torture, extrajudicial killing, aircraft sabotage, hostage taking,

or the provision of material support or resources [for such an act]." 28 U.S.C. 1605(a)(7) (2002) (emphasis added).[4]

Libya argued that it was not the "but-for" cause of Kilburn's kidnapping, torture and killing. *Kilburn*, 376 F.3d at 1127. In other words, Libya argued that Kilburn would have suffered the same fate regardless of Libya's involvement because ARC got involved only after Hezbollah had already kidnapped Kilburn. We disagreed, interpreting the terrorism exception's "caused by" language to impose "the base-line standard of proximate cause" and rejecting Libya's argument that multiple but-for causes break the chain of causation for any one of them. *Id.* at 1129 ("Such a case, in which application of a 'but for' standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard 'but for' causation as inappropriate."). Although Kilburn's death at the hands of ARC might not have occurred had he not been kidnapped by Hezbollah, that fact did not mean that Libya, ARC's state sponsor, was immune from suit for wrongful death. *Id.* at 1129. Similarly, Petrobras cannot oust the court of jurisdiction in a lawsuit resulting from its alleged fraud simply because Sete's third-party lenders might also have injured EIG by cutting off funds.

Second—and crucially—the lenders withdrew *for the same reason* that EIG's investment became worthless: Petrobras's alleged fraud plainly made Sete unsuitable for

---

[4] Since *Kilburn* was decided, the terrorism exception has been relocated from 28 U.S.C. § 1605(a)(7) to 28 U.S.C. § 1605A but the relevant language remains substantially identical to that considered in *Kilburn*. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. 110-181 § 1083(a), (b)(1)(A)(iii), 122 Stat. 3, 338–341. For consistency, we quote and cite the version included in the 2002 edition of the U.S. Code.

investment. The lenders' withdrawal and EIG's tanking investment are, in other words, two "effects" with the same cause. The lenders' withdrawal was not an intervening cause in any legally significant way because that action itself was caused by the same alleged fraud that caused EIG's injury.

EIG's allegation that Petrobras committed fraud distinguishes this case from a Second Circuit case Petrobras relies on. In *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 232–33 (2d Cir. 2002), South Africa issued a press release asserting its ownership of the domain name "southafrica.com." Virtual Countries, a U.S. company, sought a declaratory judgment that it owned the domain name and an injunction preventing South Africa from litigating the issue in an international tribunal. *Id.* at 234. The asserted basis for FSIA jurisdiction was that South Africa's issuance of the press release was a commercial act that caused a direct effect in the United States by virtue of Virtual Countries' financial losses stemming from negative investor reaction to the press release. *Id.* at 235. The Second Circuit held that the press release caused no direct U.S. effect because investors "formed their own independent assessments of [South Africa's] intentions and the possible effect of those intentions on Virtual Countries and people who would do business with it," rendering any U.S. effect "indirect." *Id.* at 237.

Here, by contrast, EIG's alleged injury—being fraudulently induced to invest in Sete—occurred well before Operation Car Wash came to light, and certainly before the lenders reacted to the revelation of Petrobras's alleged fraud. At this preliminary stage of the litigation, EIG need not precisely measure the amount of its damages. It is enough that Petrobras's alleged fraud necessarily made EIG's investment less valuable, even if only to the extent that EIG's money was used to pay bribes and kickbacks rather than to pay

shipbuilders.[5] The lenders' withdrawal did not cause EIG's alleged damages, it simply confirmed them.

## 2. The path of EIG's losses through Luxembourg is irrelevant

Petrobras's remaining argument is that any effect its actions had in the United States was mediated through Luxembourg—where EIG created corporate subsidiaries through which it funneled its Sete investment—and therefore was not "direct." Petrobras, EIG and the district court have all cast this as a debate over the locus of Petrobras's alleged tort, which we have previously identified as one factor in determining whether a tort causes a direct effect in the United States. *See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1184 (D.C. Cir. 2013). But the third clause of the commercial activity exception turns on the requisite site of the direct effects of the defendant's alleged tort, not its "locus" as a matter of tort law. It may well be—although we need not decide today—that a U.S. locus is sufficient (but not necessary) to establish jurisdiction under the FSIA. The

---

[5] Federal securities law, by analogy, allows a plaintiff to recover damages for securities that are devalued as a result of the defendant's fraudulent statements or omissions, but only as measured by "the depreciation in value of such security resulting from such [statement or omission] as to which [the defendant's] liability is asserted." 15 U.S.C. § 77k(e). This "loss-causation rule" ensures that securities law does not become an insurance policy to protect against bad investments. But the law also provides that the market's reaction to corporate fraud is a sound measure of loss causation. *See id.* (authorizing damages measured by "the difference between the amount paid for the security [and] the value thereof as of the time such suit was brought," subject to adjustment if defendant establishes portion of difference is *not* attributable to fraud).

inverse, however, is not true: a foreign locus does not always mean that a tort causes no "direct effect" in the United States.

To our knowledge no court has held otherwise. In *Atlantica*, 813 F.3d 98, 109 n.5, the Second Circuit observed that "for FSIA purposes, we have found a direct effect (at least) at 'the locus of the tort,'" and noted, *id.* at 113 n.7, that an earlier Second Circuit case, *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993), expressly reserved the question whether a foreign tort can cause a direct effect in the United States. Petrobras repeatedly quotes the Second Circuit's statement in *Antares Aircraft* that "[i]n tort, the analog to contract law's place of performance is the locus of the tort." 999 F.3d at 36. But the court went on to say that "the analogy is not precise" and, "[a]lthough a contractual provision designating the United States as the place of performance is sufficient to *vest* jurisdiction under the FSIA, a foreign tort is not necessarily sufficient to *deprive* federal courts of jurisdiction." *Id.* (emphasis in original).

*Odhiambo v. Republic of Kenya*, 764 F.3d 31, 42–43 (D.C. Cir. 2014), is also inapposite because, as a contract case, "the analogy is not precise" to a tort case like this one. In *Odhiambo* we rested our rejection of FSIA jurisdiction on the lack of a place-of-performance clause in the contract between the plaintiff and the sovereign defendant. We reasoned that if a "pay wherever you are" contract can support jurisdiction of a foreign state, a plaintiff could then unilaterally create jurisdiction simply by traveling to the United States. *Id.* at 40–41. The investment agreement between EIG and Sete does not designate a U.S. place of performance, but EIG's argument is—in part—that it would never have signed the investment agreement (which it did in Washington, D.C.) if Petrobras and Sete had not fraudulently induced it to do so. JA14. More to the point, EIG alleges that its United States presence was not mere

happenstance to Petrobras and Sete, but that Petrobras and Sete "specifically targeted" U.S. investors. JA25. Accepting these allegations as true, *Odhiambo*'s concern over plaintiffs unilaterally creating U.S. jurisdiction is misplaced here.

For the same reason, we are untroubled by the Second Circuit's assertion in *Antares Aircraft* that "some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception," 999 F.2d at 36, because EIG's financial loss does not "stand[] alone." Rather, its financial loss is alleged to have resulted from the years-long scheme to part EIG from its money under false pretenses with the goal of enriching corrupt Brazilian executives and officials. *See* JA25. At least some of the misstatements and omissions in service thereof took place in the United States, where the ultimate consequences of the fraud were later felt. JA15, 17.

Neither the Second Circuit precedent nor—more on point—our own *Bell Helicopter* and *Odhiambo* nor any other case on which Petrobras relies holds that a tort's foreign locus, without more, means that it causes no direct effect in the United States. Assuming *arguendo* that Luxembourg was the locus of Petrobras's alleged fraud, we must nevertheless determine whether the alleged fraud "cause[d] a direct effect in the United States." The key to Petrobras's theory that EIG was injured (if at all) in Luxembourg is that EIG "booked the loss" from its Sete investment in Luxembourg and only somewhere down the line was that loss felt, indirectly, in the United States. Three flaws doom Petrobras's argument.

First, the legal significance of corporate form in an FSIA action is not as settled as Petrobras suggests. On this point Petrobras's reliance on *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003), is misplaced. To determine whether a foreign-state defendant is immune from suit, the Congress indeed

"elected to hew to 'the general rules regarding corporate formalities," Reply Br. 8 (quoting *Dole Food*, 538 U.S. at 476), including the principle that "the corporation and its shareholders are distinct entities." *Dole Food*, 538 U.S. at 476. Thus, the Supreme Court concluded that "[a] corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares." 538 U.S. at 477. But Petrobras asks us to fashion the *Dole Food* principle of corporate formalism—which *narrowed* the scope of foreign-state immunity—into a limitation on what entity can be an FSIA plaintiff, with the effect of *broadening* the scope of foreign-state immunity. We decline the invitation.

The second flaw in Petrobras's focus on the Luxembourg subsidiaries is that it requires an unrecognized identity between corporate citizenship and the locus of an investment loss. In *Weltover*, the Supreme Court expressly rejected the argument that a plaintiff's foreign citizenship necessarily determines FSIA jurisdiction. 504 U.S. at 619 (FSIA jurisdiction established notwithstanding plaintiffs were "all foreign corporations with no other connections to the United States") (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983) (FSIA "allow[s] a foreign plaintiff to sue a foreign sovereign in the courts of the United States, provided the substantive requirements of the Act are satisfied.")). In *Atlantica*, 813 F.3d at 111, a case upon which Petrobras heavily relies, most of the plaintiffs were not U.S. citizens. The Second Circuit nevertheless held that FSIA jurisdiction extended to the foreign plaintiffs' claims even though they did not show—and apparently could not show—any harm to themselves in the United States, but only to their U.S.-citizen co-plaintiffs. 813 F.3d at 112 ("[H]ad all of the Plaintiffs been foreigners, they could have successfully premised FSIA jurisdiction on the effect that [the defendant's] alleged misrepresentations had on non-party United States investors, provided that Plaintiffs

could adequately establish the existence of United States investors so affected.").

The third defect in Petrobras's "locus" argument is that, although EIG may have "booked the loss" in Luxembourg—a questionable proposition as there is no record support that EIG Luxembourg maintains any Luxembourg accounts as it has no employees there and receives its mail at a U.S. address — presumably EIG would have booked a loss in the same amount in the United States. *See* Fin. Accounting Standards Board, *Statement of Financial Accounting Standards No. 157: Fair Value Measurements* (Sept. 2006) (requiring "mark-to-market" accounting reflecting fair market value of investment assets). Petrobras cannot avoid U.S. jurisdiction because the effects of its fraud ricocheted halfway around the globe before coming to rest in EIG's Washington, D.C. office. In *Weltover*, the Supreme Court upheld FSIA jurisdiction even though the only connection between the defendant's actions and the United States was that "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Weltover*, 504 U.S. at 619. There is no basis to treat EIG's investment loss differently from the failure to deposit scheduled interest payments in New York bank accounts.

For the foregoing reasons, we conclude that Petrobras's commercial activity in Brazil caused a direct effect in the United States, including a direct effect on EIG. Accordingly, Petrobras is not immune from EIG's suit and the district court's order denying dismissal is affirmed.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: While I respect my colleagues' careful and well-constructed opinion, I nonetheless remain unconvinced that the courts of the United States have jurisdiction over this matter under the Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1330, 1604-1606. While I agree with my colleagues that plaintiffs-appellees have established that the acts of the Brazilian agency may have "effects" in the United States, the controlling issue in the case is whether they have shown *direct* effects. As that is the sole controlling issue in the case, I will not belabor or contest the majority's statement of the facts, but will deal only with that issue.

As the majority correctly reasons, Petrobras, an instrumentality of the government of Brazil, "'is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.'" Maj. Op. at 7-8 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)). The statutory exception relied upon by appellee and the majority arises from a provision of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2). In relevant part, that statute provides jurisdiction to the courts of the United States over a case involving a commercial activity that "causes a *direct* effect in the United States." *Id.* (emphasis added). While the court sets forth an impressive analysis of the causation of the effects, that is not sufficient. The statute requires a *direct* effect. It is "one of the most basic" canons of statutory interpretation that "a statute should be construed so that effect is given to all its provisions." *Corley v. United States*, 556 U.S. 303, 314 (2009). The adjective "direct" is as much a provision of the statute as the noun "effects." We must assume that Congress intended each word to carry its plain and usual meaning. The failure of Sete as described in the majority opinion obviously had effects.

Were those effects direct ones in the United States?  It is not apparent that they were.

As the majority notes, the EIG Funds formed EIG Sete Parent SARL as a Luxembourg corporation.  The Luxembourg corporation formed EIG Sete Holdings SARL, also a Luxembourg corporation.  EIG Sete Holdings invested $221 million in FIP Sondas, a Brazilian partnership, which ultimately invested the funds in Petrobras.  Thus, the investments, the loss of which constituted the harmful effects of the failure of Sete, flowed from the EIG Funds to EIG Sete Parent, to EIG Sete Holdings, to FIP Sondas, and only ultimately to Sete itself.  The effects in the United States of the alleged tortious conduct in Brazil, therefore, were at least three steps removed.  This does not seem to comport with normal understandings of "direct," which is defined as "stemming immediately from a source." *Direct*, MERRIAM-WEBSTER DICTIONARY, http://www.Merriam-Webster.com/dictionary/direct (last visited June 19, 2018).

None of the cases cited by appellee or relied upon by the majority provide a basis for concluding that those effects were "direct" in the United States.  *Odhiambo v. Republic of Kenya*, 764 F.3d 31 (D.C. Cir. 2014), as the majority discusses, concerned a rejection of FSIA jurisdiction on the lack of a place of performance clause in a contract.  Maj. Op. at 14.  While the majority is correct that this does not mandate the rejection of jurisdiction in the present case, it certainly does nothing to establish the directness of effects warranting the assumption of jurisdiction under § 1605(a)(2).

Similarly, as the majority again notes, the Second Circuit's assertion that "some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception," *Antares Aircraft, LV v. Fed. Rep. of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993), may not mandate rejection of jurisdiction on the present

facts. Nonetheless, it is certainly consistent with a conclusion that the exception does not apply in this case.

Neither the cases discussed above, nor any of the other cases relied upon by the majority, mandate a conclusion that a loss suffered by a Luxembourg entity, owned by another Luxembourg entity, in turn owned by United States entities, constitutes a direct effect in the United States. Implications of a holding to that effect seem to me to be inconsistent with Congress's express language in the relevant exception. Where do we cut off the chain between an effect and a direct effect to give meaning to the congressional expression? If the plaintiff in this case were not EIG but a shareholder of EIG, would that shareholder's loss be direct? I think not. It seems unlikely that Congress would have included as plain a word as "direct" in the creation of an exception to foreign sovereign immunity unless it had more apparent content than the majority's interpretation would allow.

In the end, for the reasons set forth above, I respectfully dissent.